We are now recording. Hear ye, hear ye, this Honorable Appellate Court for the Second Judicial District is now in session. The Honorable Robert D. McLaren presiding. Your Honors, the first case on the docket this morning is 2-22-0041, Henry, the marriage of Jeffrey R. Hyman, Respondent Appellant. Arguing for the Appellant, Mr. Eric J. Schwab. Arguing for the Appellee, Mr. Matthew D. Elster. Thank you. Mr. Schwab, you may proceed. Thank you, and may it please the Court. Distilled to its essence, this appeal raises the question, what does it mean to say in a marital settlement agreement, in a contract, that something is or it's undisputed that in the marital settlement agreement, my client, Mr. Hyman, did disclose his ownership of his company, StrongSuit, LLC. It's also undisputed that during the marriage, and in fact, while the divorce proceeding was ongoing, StrongSuit entered a consulting contract with a third-party company, Fitness Cubed, and that Fitness Cubed paid StrongSuit for its work, which was limited to a couple of hours a week, in the form of stock options. Now, it's also undisputed. We don't contest that Jeffrey chose to have the Fitness Cubed stock options issued in his name individually. And then he immediately told his wife of those options, those stock options? I'm sorry, Justice Shostak, I missed the first part of your question. And he disclosed those stock options to his then-wife? No, not specifically. At the time, the discovery was ongoing when he received the stock options. And he was disclosing, in further answer to your question, Justice Shostak, he was required to disclose his ongoing efforts to build a new company, per the language of the order, which Mr. Hyman did do. There was a point, as discovery was ongoing, and negotiations to resolve the case were ongoing, that Ms. Hyman issued a discovery request, her second supplemental, I believe. Can I ask a question? What difference does the value of the stock options have when he fails to disclose his ownership of that stock? The potential. What difference does the value make? Well, Justice Burkett, I know you're referring to the fact that even the trial court found that at the time, the stock options had nominal value. And I think that that's an important difference, coming back to my first question, because in any case, and especially in a case involving a settlement, assets are disclosed, but nobody discloses every penny, nobody discloses every pencil. Are you familiar with In re Marriage of Peters, the case out of this district? I don't have the facts of that case at my fingertips. Well, in that case, and that's 326 Hill at 3rd, 364, 2001 decision. In that case, non-vested stock options were marital property required during the marriage, and the husband was required to disclose it. The value at the time had nothing to do with whether or not there's an Right, Justice Burkett. And certainly, I'm familiar with the case law that has developed around stock options and the issue of vested versus unvested. And our position isn't predicated on the fact that they were unvested at the time. I mean, that goes to their value, obviously. And as far as Mr. Hyman's duty to disclose, the tricky question here is that, again, you have discovery stops, and both sides say we're satisfied with the discovery. And Mr. Hyman is disclosing the company and believes and moves forward in good faith that that's an adequate disclosure. And the trial, even the trial court found that didn't believe that Mr. Hyman was trying to conceal anything. And so this was a prove up after it was all negotiated, correct? And then at the prove up, they asked him, are these the only assets, basically, that you have? And he indicated yes. Did he not? Yes, he did. And was that the truth or was that a lie? Well, I certainly think in the trial court didn't find that was a lie. What we had was that in his view, he had disclosed everything exactly as he was required because he assumed and understood that everything that by disclosing StrongSuit, he was getting everything that came with it. And in our briefs, we referred to the fact that the valuation of StrongSuit on the marital balance sheet, which was part of the record, simply stated as its value TBD. And we can get into what the initials refer to there because that's even a little tricky. But certainly, that's open ended. That says we're not delving down into further detail. That's a way of saying we're not looking into every penny of value here. And so that shines the light on Mr. Hyman when he's answering at the prove up, did you disclose everything? He's saying absolutely yes, because it doesn't occur to him that he's got to open up StrongSuit and break it down to every little piece. It might not have occurred to him, Mr. Schwab, but wouldn't that occur to the lawyers? Well, I don't think that that would be the case because they were operating under the same impression. I mean, that this was an ongoing, this was a disclosed issue that the business interest, certainly, I think it's clear from the record. I don't want to extemporize, but that this wasn't a huge issue. But just by looking at the balance sheet, this is pretty far down the list. Yes, Mr. Justice Burkett. What about the language in the marriage settlement agreement, the future evidence of a new asset or new income, and he didn't disclose it. And the trial court stated you had a duty to disclose anything discovered after that fact. They agreed, regardless of who held the asset, it would be split 50-50. Is that language not binding? Well, that language is binding, but I think it now has come to bite my client by creating a trick bag because, again, my client believed that he was very comfortable with that language. Your client represented that the company was defunct. He used the word defunct, but held on to it. That's correct, Justice Burkett. But in the actual marital settlement agreement, and I could refer to section 3.2, which we referenced in our argument and discussed with the trial court, that that was a provision of the marital settlement agreement. Two things in answer to your question. One, that provision refers to StrongSuit. It says StrongSuit DBA startup therapist, I believe. So by that point, the defunct was no longer the it's a short paragraph. I could read it to the court, and I could dig out the citation of where it is in the record. But what that paragraph says is Jeffrey shall retain as his sole and separate property his interest in the business entity known, leaving the word as, StrongSuit LLC DBA startup therapist, and shall also pay and be solely responsible for any obligations liabilities associated with his ownership interest. And I think that reflects the intent of the parties. The phrase associated with his ownership interest is intended to give the broadest possible meaning to that. Now, that's negotiated because that allows protection to Ms. Hyman for all the potential downsides that should arise of that. But just as it's all the liabilities associated with the company, our position is that the same understanding was as far as any assets associated with the companies. He gets any assets associated with StrongSuit, and he takes the liabilities with that. That's not what your marital settlement agreement says, Mr. Schwab, which what you read and right on the heels of that comes your marital settlement agreement. As Justice Burkett pointed out, it's 50-50. So nothing in there says, oh, he gets all the out liabilities, plus he gets the asset, and she doesn't get the liabilities. Nowhere in the marital agreement does it say that, does it? I'm not sure I understand because I think in from our view that an undisclosed, this is the 3.2 that I read was our understanding was that he had disclosed StrongSuit and the assets that came with it. And certainly it says in the marital settlement agreement in the balance sheet, he gets 100% of StrongSuit. But Justice Shostak, you're absolutely right. The non-disclosed asset provision says 50-50. And it comes back to our initial question, the essence of our appeal is, was the trial court correct in finding that this wasn't disclosed given this language and the overall intent within the four corners of this settlement agreement that we think clearly said, you get StrongSuit, you get the whole kit and caboodle, lock, stock and bagel, you get the liabilities, you get the assets. And that's our concern is that it's unlikely that he could have come back and said, well, this liability I personal liability. So I didn't, I forgot to disclose that we should share 50% responsibility for the law. It's obviously absurd to think that that would be an option. Mr. Schatz, did the wife know about the stock options at the time she entered into the marital settlement agreement about splitting 50-50? Yeah, Justice McClaren, I think she testified that she did not know. And I think we also enlisted in testimony from her that she didn't know very much and didn't indicate much interest in knowing what the assets of StrongSuit were, what its earnings were, what its liabilities were. And our position is, is that's the kind of thing that she was willing to suspend discovery and move on from that and let Mr. Hyman take the whole company. If she didn't know what the assets were for the company, how could she make any informed decision relative to whether or not there should be quid pro quo or some consideration given for agreeing to allowing Mr. Hyman to take over whatever interests there might remain in the business, especially when she wasn't told that there was any or weren't any assets in the business? Well, Justice McLaren, I think that's a great question. That's the question that we ask in our argument in terms of she decided as part of the bargain to settle the case and to stop the discovery process. She had a discovery question out there and we had discussed whether the compliance was required in Mr. Saab's October 14th letter that is part of the record. And she decided as part of the bargain for exchange to stop that discovery process. She certainly had the ability to decide to continue the discovery process rather than settling the case at the time. The logic of your argument is that if there are assets or things or even is that, well, she forwent or forfeited, waived, gave up, relinquished any rights she might have, even though she was totally ignorant of what it was that she was relinquishing, which do you have any citation to authority to establish that ignorance is bliss? Well, no, I don't have a citation to authority that ignorance is bliss, Justice McLaren. And I see the point that you're making. But again, the distinction we make is that this wasn't undisclosed in our view. This was disclosed and it was a question of the degree of disclosure in that. And I know Justice Burkett has a question, so I'm a little torn. Okay, go ahead. Finish your answer to Justice McLaren's question. Well, my answer to you, Justice McLaren, is that this is clearly a case where it comes into a degree of disclosure. And we cited the cases, which we acknowledge are 2-1401 cases about vacating an agreement. But in the case of Goldsmith, I think it was, the wife tried to vacate the agreement saying, well, the husband hadn't disclosed the specific nature of his interest in the bank. He didn't say that it was stock. But we had cases where the courts addressed degrees of disclosure. Okay. That was a 2-1401. Yes. Goldsmith was. We distinguish that in Brubaker. And what is your response to Brubaker, where Brubaker seems to be on all a, you know, a hiding of an asset and a trial court. And here, just as in Brubaker, during approval, the answer was no. There was no other assets when, in fact, there was a condominium in Chicago. Here, the answer was, no, this is all we have. Why isn't Brubaker on all fours? And we're not required to follow Goldsmith, but, you know, Brubaker is from this court. Right. And Justice Burkett, I would say that the key difference in Brubaker, it's really critical for us, is that in Brubaker, there was a finding that the husband intentionally, I think it was the husband, perhaps the wife, the party that was supposed to disclose concealed the asset. And there was a finding of- What difference does that make? In the big scheme of things, what difference does that make? Whether what his intent is, it's the same. It's concealment. It is saying, no, this is it. This is it. This is all I have. It's a different degree of concealment. Right. It's still concealment. In addressing your concerns, Justice Burkett and Justice Shostak, I guess degree of concealment, the flip side of that is degree of disclosure. And you'll have in each case where the parties are fighting about it, one will call something a degree of concealment and a degree of disclosure. And I think that certainly describes the net my client is now caught up in, but certainly- And you're certainly not suggesting, following up on what Justice McLaren says, you're certainly not suggesting that the burden of proof or the burden for discovery is on the wife in this case. It wasn't her burden to dig further to determine the value of this company, is it? Well, Justice Shostak, and I see that my time is up, but I'd like to address your question. The cases we addressed from 2-1401 deal with Illinois policy about the point of entering the agreement that each party has certain duties or risks they assume when they give up the discovery process. And I think that that should have informed the trial court, which I will add found that my client was not trying to conceal anything. I think that should have informed the trial court in its finding, and it should have found that the disclosure of strong suit was sufficient to disclose the stock options as well. And if you have any more questions, I'll answer them, but otherwise, my time is up. Any other questions? No. No further questions. Thank you, Mr. Schwab. Thank you, Mr. Schwab. Thank you. Mr. Schwab, relative to Brubaker and Justice Burkett's question, did Brubaker have an agreement regarding discovery of assets after the fact, as in this case? I would look back into Brubaker, but I don't recall noting that. So wouldn't that agreement make the argument that you made relative to the relative negligence or lack of diligence, make it immaterial based upon the agreement that they entered into? Well, I think that the case law from Brubaker and behind it, Goldsmith and the other cases cited, which should inform the court about what, again, what it means to say not disclosed versus disclosed, that those cases are all about saying it's not cut and dry. You need to look into and see what the party's intended at the time, how much disclosure the party's intended to accept at the time they entered the agreement. That would be my answer. Any other questions? No. Thank you. You'll have an opportunity to make rebuttal. Thank you. Thank you. Mr. Elster, you may proceed. Thank you, your honors. Good morning. Morning, counsel, and may it please the courts. My name is Matthew Elster, Beerman, LLP, on behalf of the appellee, Rachel Hyman, who is present on the Zoom this morning with your honors. At bottom, this case is about 500 stock options which the appellant, Jeffrey Hyman, personally, in his individual capacity, acquired in the middle of the party's contentious divorce proceedings. Options which, by his own admission, he never disclosed, options which are mentioned nowhere in the party's MSA, options which do not appear on the party's balance sheets, and options which fall squarely within the clear and unambiguous undisclosed asset provision which the parties agreed to place into their marital settlement agreement. Well, Mr. Elster, couldn't you have gone a little, digging a little deeper into this company when he disclosed it, doing some depositions, tendering some discovery, something, requested disclosed a little bit more about this company? Did you see any of that? There was ample discovery, Justice Shastrick, and if you look at the record, not only did my client issue discovery at the outset of the case, which Mr. Hyman answered regarding StrongSuit saying that it was defunct, saying that his bank account was closed, he was ordered to keep a job diary. And this is where I think things get interesting. If you look at the job diary that he completed, that job diary covered the relevant period in question, June of 2015. And what does he say in that job diary? That he took a Myers-Briggs talent inventory, that he met with vocational evaluators, that he read books. This job diary covers the period of June 9th, 2015, the date that he inked this deal and acquired these options individually. There is not a single mention anywhere in his job diary, anywhere in his discovery responses of any work performed for Fitness Cubed. It was only two hours a week, right? I mean, and this is a, his business is, he's a headhunter, essentially, right? He looks for talented people. Justice Burgett, according to his own admissions, he was a serial entrepreneur and was throughout the marriage. And if you look at the record, Mr. Hyman started companies left and right, some were successful, some were not. And the nature of an entrepreneur's work, it's a gamble. You know, there's risk involved. Some business ventures boom, some bust. And that is why the parties structured this deal in the way that they did. You know, I think it's important to look at the language of the undisclosed asset provision and see what it actually says. You know, there's, it's certainly not uncommon to include an undisclosed asset provision in a marital settlement agreement. What sets this case apart is the valuation provision the parties used. They said that either, that upon discovery, they would divide 50% of the greater of the value at the time of judgment or at the time of discovery. Why did they do this? They recognized that Mr. Hyman's ventures could succeed or could fail. And the whole purpose was to discourage exactly what happened here, to discourage nondisclosure and to prevent the nondisclosing party from obtaining a windfall in the events that the undisclosed venture took off, which is precisely what happened here. The trial courts applied this provision, this clear language faithfully, and did exactly what the parties agreed. They agreed to divide undisclosed assets unconditionally. This is important, unconditionally. This is not a 214-01 case. The parties didn't place any temporal limitations on when the discovery had to recur. There was no prerequisite of diligence. There was no consideration of intents. The party's MSA, which is all this court is tasked with enforcing, says if an asset was undisclosed, it must be divided. The trial court faithfully answered that question correctly. This court should as well. And I would refer your honors to your recent decision in Medline Industries, which we cite in our brief, which provides that a contract must be enforced as written without modifying terms or adding language that the parties did not agree to. That's what Mr. Hyman is asking your honors to do today, to impose a diligence requirement, to say, well, she could have discovered, she could have found this out discovery. That is not what the parties agreed upon. Let me ask you this. Would the trial court, had the trial court admitted the settlement discussions, would that have made any difference at all? I don't think they would have, your honor, because at the end of the day, you know, counsel began by saying that the facts are not in dispute. Well, the undisputed fact is that Jeffrey Hyman acquired these shares in his own name. He made an intentional, purposeful decision for whatever reasons, tax reasons, compliance reasons. It's immaterial. He made a conscious choice to take these shares as his own name and his own name. So no, I don't think that it would have made a difference because they still are undisclosed assets that he owns. You know, counsel's argument rests on the fundamentally flawed assumption that these shares, these options rather, were assets of StrongSuit. Mr. Hyman made the choice to make them not assets of StrongSuit. And frankly, it begs the question if Ms. Hyman had sent a subpoena to StrongSuit saying, show us all your assets, where are these options on StrongSuit's balance sheets? If StrongSuit was sued and a plaintiff obtained an adverse judgment against them, these options would not be available to satisfy this judgment because they were not assets of StrongSuit. And frankly, if the options were assets of StrongSuit under this court's Mr. Hyman, they were still a marital asset, even if the business was awarded to him. Now, what does Mr. Hyman argue in response to the trial court's finding, in response to its ambiguous provision to the facts here? First, he tries to turn this into a 214-01 case. And your Honor has asked questions about Goldsmith. I believe Goldsmith is completely inapplicable. While yes, there was a claim in that case to enforce, reading the decision itself, it turns almost exclusively on the 1401 factors. And I will readily admit that if this recital and the party's MSA didn't exist, if this was simply Rachel coming in and claiming fraud and trying to vacate the MSA, this would be a very different case. But it's not. Goldsmith didn't on the contract. And Lyman, Brody, and even Brubaker, which I believe helps us, none of those cases had undisclosed asset provisions like the one we have here. And again, I reiterate, if the parties wished to impose additional requirements on the disclosure of assets, or on the discovery of assets rather, they could have done so, but they didn't. Now, Mr. Hyman, in his brief, spends a lot of time discussing the fact that these shares were of de minimis value. And then for the first time in his reply brief, cites the fact that the parties valued them as TBD. Well, as to the second point, as your Honors are well aware, arguments raised for the first time in a reply brief are not properly before the courts. Mr. Hyman's opening brief makes no mention of this TBD issue. It was raised for the first time on reply. I don't think it's properly before your Honors. But Council, what does TBD mean? I would assume to be determined. I don't know the marriage settlement agreement anywhere. Excuse me, Your Honor? Was it defined anywhere? It was not and it's not in the body of the agreement. It only appears on the balance sheet appended there too. Were there any letters that are of record or communications between the attorneys or the parties indicating what the definition was? Not that I'm aware of, Judge. Does the definition have any relevance if the asset was undisclosed? I don't believe that it does. And I don't believe it does. If it is to be determined, is it a known unknown or an unknown unknown? And relative to either of those categories, does TBD have anything to do with anything? I don't believe that it does, Justice. I suppose this would be a known unknown to the extent that the parties knew that they were not placing a specific dollar value on StrongSuit. It's not a question of to be determined for StrongSuit. It's to be determined what the value was of the stock that was owned by Mr. Hyman. Well, that begs the question. Did they know that they were dividing stock? And I think Justice Shostak, you asked this question. This was unknown to my client throughout these entire proceedings. Again, these parties were involved in litigation for almost a year. There was discovery issued. There was no supplementation. There was a job diary order that made no mention of this. You know, six months into this case, smack in the middle at its heights, Mr. Hyman signs this deal. He signs a contract on behalf of StrongSuit. He signs an option agreement individually. And for six months, he makes no mention of it whatsoever to his wife. He doesn't list it on his job diary. He doesn't disclose it in discovery. It is completely unknown to my clients. Well, in Mr. Schwab's reply brief, he indicates that the fact that your client let that StrongSuit value to be left undetermined just shows that that's the way they wanted to leave it, that without further discovery, she was fine with leaving the value undetermined because she agreed to it in the marital settlement agreement. She did. Right. The parties did not engage in a full business valuation of a business that was, you know, theretofore defunct, whose only bank account had closed in 2010, which was... So you relied on their representations, Mr. Elster? Well, we relied on the representations, one. But two, we baked in this undisclosed asset provision, knowing that if those representations were false or if they were material emissions... I'm not going to sit here and say that Mr. Hyman intentionally lied, you know, because frankly, it's irrelevant. There's no mens rea requirements in the party's MSA, but they did protect themselves. And I think that provision was designed to protect my clients for the precise situation we have before us today. Justice McLaren, did I see a hand up? No, I didn't. Oh, I apologize. So... I wasn't asking a question. I just got my hand up, you know. He was fixing his hair. And, you know, I believe one of your honors referenced, you know, raised an issue, which I'll describe as waiver, whether or not my client knew what she was giving up. And I refer your honors to your decision in 20... the 2013 decision, it was a Justice Burkett case in Elsinore versus Brown, where the court specifically held that waiver must be knowing. You cannot waive something that you don't know what you're giving up. And that's essentially what Mr. Hyman is arguing here, that my client waived her rights to these shares, waived her right to further discovery. And yes, she agreed not to engage in further discovery. The party settled their case, which is what the Illinois Marriage and Dissolution and Marriage Act strongly urges them to do. There is a strong public policy in this state towards... to encourage settlements. But there's also a public policy of disclosure. There are Supreme Court rules regarding discovery and supplementation. And again, I get back to it. At bottom, this is a contract case. The country... the MSA says what it says, there is no dispute that Mr. Hyman owned these shares individually, and he did not disclose them. And I would ask your honors to consider the ramifications of Mr. Hyman's arguments. Let's say instead of options in strong suit... in a fitness cube, he received cash. Let's say they handed him a million dollars and said, here's what we're paying you for this consulting work. It goes into his personal bank account. Does he get to say after the fact, well, I subjectively believed that this money was an asset of my business. Therefore, I'm under no obligation to disclose it. Let me ask you this, Mr. Elster. If he disclosed that he was part of this business, and then he didn't pick up the shares for the business until after the settlement, the marital settlement agreement was signed after the divorce, would he still... would she still be entitled to those shares? So that's an interesting question that I think turns on Section 503 B3 of the Marriage Act. And that's, you know, I think counsel alluded to this point in his brief, but options awarded to either party during the marriage are marital. And the questions regarding vesting schedule, what has to be done in order to acquire them, those all go to how they get allocated. And the problem... The long and the short of it is here, had he not acquired those shares on June 9, or smack dab in the middle of these negotiations, we might be talking about a different case. Absolutely. You know, the bottom line is, his silence prevented my clients, it prevented the trial courts from addressing this issue. They didn't know, so they couldn't address it. For all we know, Ms. Hyman could have walked away and said, I want no bid, I want no interest in this, they're all yours. You know, Mr. Hyman complains about how this is a windfall to my clients. The whole otherwise is a windfall to him. Had he disclosed these, maybe this de minimis value would have caused Ms. Hyman to say, nah, they're yours. The fact of the matter is, his silence deprived her of a choice. Had he disclosed these, had he been forthcoming and open, this would have been a very different case. We probably wouldn't be sitting here today. The MSA should be applied as written. The trial court correctly applied it to the facts, and I would ask this court to do the same. Any other questions, Joe? No, thank you. Thank you. No further questions. Thank you, Mr. Rice. Mr. Schwab, you may proceed with rebuttal. Thank you, Justice McLaren. And I'd like to, in my rebuttal, I'd like to go to this question of waiver, because I think that the contract itself, the MSA and the balance sheet really exhibit the intention behind that. Ms. Hyman made a knowing waiver. She chose to let go with a degree of discovery she was satisfied with. I think that they didn't go into all the, they don't have a detailed disclosure in their balance sheet about personal items in the house. They disclosed three companies. As Mr. Elster mentioned, our client is an energetic entrepreneur, and he had three entirely separate companies. He had Retrofit, he had Ameritox, he had StrongSuit doing business as startup therapist. All three of those companies are disclosed simply in the balance sheet as a single line. 100% to my client, value TBD. Yes, Justice McLaren. I believe Justice Burkett mentioned or was cited as the author of a case that basically said that waiver is involved in a voluntary act. And in order to be a voluntary act, it has to be knowing. These are the forfeiture where the right to be protected or observed has been either negligently or recklessly disregarded, or more specifically, intentionally forfeited, which would essentially be the same thing as a waiver. So how do you address the fact that if she didn't know that there were stock options that belong to anyone, how can she know to walk away? As I think was options had a nominal value, and she said, fine, they're yours. That would probably be a forfeiture. It wouldn't be a waiver because she wouldn't know at the time, but she essentially forfeited it. Because to say that she knew it because it was nominal value, we can get into an argument about whether it actually was. But something even further, didn't he not represent that the company was defunct? So the questions asked by Justice McLaren wouldn't even be relevant because she's relying on the fact that he represented it was defunct, right? Well, in answer to your question, Justice Shostak, and then I'll get to much earlier, the initial part of the divorce that they had identified the company as defunct. And yes, as we explained, as he testified, the company was reactivated. And in the marital settlement agreement, it's acknowledged that the company is doing business. It was said strong suit doing business as startup therapist. I would also, and going to your question, but also Justice McLaren's question, again, in the discovery, Ms. Hyman had, if she had chosen not to settle, she had outstanding discovery requests that were saying, let's start drilling down on all of the assets and everything about each of these businesses of yours. And then she made a choice. Let's settle this. I will give them to him. That's converted them from unknown unknowns to known unknowns. So again, you're representing that the law is that if you don't do your due diligence in discovery, you forfeit or you forego any assets. Well, I see that point. And I don't think that we would want to set a legal rule that would be that hard, but certainly the legal rule has to recognize that there are degrees of discovery. And in this case, I think we look to the marital settlement, the agreement itself to try. And there are degrees of disclosure, correct? Yes. I think that was actually the phrase I meant to use. What about counsel's point that he Jeffrey even failed to disclose it in his monthly job summary? Well, the Justice Burkett, yes. The monthly job summary had very specific language. Again, this was an order that was, I believe, worked out by the parties. And what the decision was, was to say, tell us about your efforts towards a new business venture. And behind that, I think you can adduce that the intention was if this guy's going to have a big breakthrough new business, we want to make sure we're getting our arms around that as part of the settlement. And there was concern that he wasn't working. As part of our arguments, we've said the ultimately the bargain for exchange was Ms. Hyman accepted. We'll impute time. We'll impute income to you, 200,000 a year, because you're unemployed right now. You're not making anything. I'll take the money in hand and stop worrying about these businesses that even here, the difference is that there was two hours a week of consumption. Two hours a week doesn't count. I mean, that's basically your argument, right? It doesn't matter. Two hours a week doesn't count. No, I think that two hours a week, it can all count, but the trial court needs to look and see where the degrees of disclosure, what's appropriate in the context of the marital settlement agreement, the contract and what the parties intended with the statement about non-disclosure. And we think that's a complex question. I see my time's up, but I'm happy to continue entertaining these questions. Any other questions? No, thank you, Judge. Thank you. Thank you, gentlemen. We'll take the case under advisement and render a decision in apt time. Mr. Marshall, will you please close out the proceedings? Thank you. Thanks, Matt. Will I be seeing you again at 1130? Could be. I've got another one up today, Eric.